**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CHIMA ENTERPRISE INC., ET AL.,<br>     *Plaintiffs*,<br><br>     v.<br><br>CHUBB NATIONAL INSURANCE<br>COMPANY, ET AL.,<br>     *Defendants.* | No. 3:23-cv-1331 (VAB) |

**RULING AND ORDER ON MOTION TO DISMISS**

Chima Enterprise Inc., ("Chima Enterprise") and Bruno Chima (collectively "Plaintiffs")
have sued Chubb National Insurance Company ("Chubb National"), ACE Property & Casualty
Insurance Company ("ACE Property"), and ACE Fire Underwriters Insurance Company ("ACE
Fire") (collectively "Defendants") alleging breach of contract, breach of the implied covenant of
good faith and fair dealing, violations of the Connecticut Unfair Trade Practices Act ("CUPTA")
and Connecticut Unfair Insurance Practices Act ("CUIPA"), fraudulent misrepresentation, and
negligent infliction of emotional distress.

Defendants have filed a motion to dismiss Plaintiffs' Complaint for failure to state a
claim under Federal Rule of Civil Procedure 12(b)(6).

For the following reasons, the motion to dismiss is **GRANTED IN PART** and **DENIED
IN PART**.

The motion to dismiss is **DENIED** with respect to Count Six alleging breach of contract
by ACE Fire.

The motion is **GRANTED** with respect to all other Counts.

To the extent that any of the deficiencies identified in this Ruling and Order can be remedied, Plaintiffs must file a motion for leave to amend the Complaint by **November 1, 2024**. If such a motion is not filed by **November 1, 2024**, then all of the claims dismissed by this ruling and Order shall be deemed dismissed with prejudice, judgment shall be entered for Chubb National, and ACE Property, and the caption of this case shall be amended accordingly.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Allegations

Chima Enterprise owns a commercial property in Hamden, Connecticut, that it leases to over thirty tenants, including salons and barbershops, and uses as its own headquarters. Compl., Count One ¶ 5, ECF. No. 1-1 (Oct. 12, 2023) ("Compl.").

On June 12, 2021, Defendants allegedly issued an insurance policy covering the property. *Id.* ¶ 6.

On September 9, 2021, AT&T began work on the rooftop of the property, upgrading old wiring and telecommunication systems. *Id.* ¶ 8.

On September 12, 2021, tenants at the property began complaining of toilets not flushing and clogged sinks on the top floor of the building (the "September Incident"). *Id.* ¶ 9. Chima Enterprise allegedly attempted "standard plumbing," which failed to fix the problem. *Id.*

On September 18, 2021 and September 19, 2021, Chima Enterprise allegedly employed Roto Rooter emergency plumbing services to remedy the clogged sinks and toilets. *Id.* ¶ 10. Roto Rooter technicians attempted to snake the drains, which failed to fix the problem. *Id.* ¶ 11. After standard snaking did not solve the issue, Roto Rooter technicians investigated the property and allegedly found "trash, bottles, aluminum cans, caution tape, multiple electrical/telecom wires,

and other items of debris stuffed in the rooftop plumbing drainpipes" near the cell tower where AT&T had worked. *Id.* Due to the depth of the pipes and total number of wires, Roto Rooter could not remove the blockage. *Id.*

On October 13, 2021, "catastrophic breakage" of a pipe allegedly occurred on the property, causing black water and sewage discharge in the basement (the "October Incident"). *Id.* ¶ 13. Chima Enterprise employed a general contractor, who allegedly discovered telecommunications debris and electrical wires similar to what was found in the rooftop pipe, as well as standard waste like toilet paper, in the damaged pipe. *Id.* ¶ 14.

On October 15, 2021, Chima Enterprise filed a claim under the insurance policy issued by Defendants. *Id.* Defendants created two separate claims, one for the September Incident, and one for the October Incident.

In November of 2021, Defendants provided a damage assessment that allegedly estimated the cost of rebuilding to be $539,370.53. *Id.* ¶ 17.

In January of 2021, Defendants employed a firm to inspect the property. *Id.* ¶ 18. The firm allegedly determined that the September Incident was the result of a blockage in the building's internal pipeline, and the October Incident was the result of a pipe break with debris found nearby including common items found in bathrooms as well as electrical and telecommunications wiring. *Id.* ¶ 20.

On January 26, 2022, and January 31, 2022, Chima Enterprise requested a $100,000 advance to begin rebuilding the property. *Id.* ¶ 22. Defendants allegedly did not respond. *Id.* ¶ 23.

On March 3, 2022, Chima Enterprise notified Defendants that it would face additional costs if payments were delayed. *Id.* ¶ 23.

On August 12, 2022, Defendants allegedly approved two Sworn Proof of Loss statements and provided initial payments. *Id*. ¶ 24. The payments did not clearly state the coverage provisions under which they were paid. *Id.* The payments were allegedly insufficient to cover the repairs on the property. *Id.*

On October 27, 2022, Defendants allegedly admitted by e-mail that coverage over the incidents had been unanimously agreed upon. *Id.* ¶ 26.

In January of 2023, Defendants requested an additional appraisal. *Id*. ¶ 31. Chima Enterprise sent Defendants an updated appraisal which allegedly calculated losses and rebuilding costs to be over $1.8 million. *Id.* ¶¶ 31–32.

On February 15, 2023, Defendants denied additional coverage over the incidents based on the "Water Exclusion" section of the insurance policy. *Id*. ¶ 32.

Mr. Chima, the owner and principal officer of Chima Enterprise, alleges that as a result of Defendant's conduct, he has suffered mental trauma, anxiety, and stress, which have required him to pay money for medical treatment. *Id.* Count Five ¶¶ 41–44.

### B.  The Insurance Policy

The covered water damage section of the insurance policy[1] provides:

> e. Water Damage, Other Liquids, Powder Or Molten Material Damage
>
> If loss or damage caused by or resulting from covered water or other liquid, powder or molten material occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. We will not pay the cost to repair any defect that

---

[1] While not expressly incorporated into the Complaint in its entirety, the insurance policy is "'integral' to the [C]omplaint and, accordingly, a fair object of consideration on a motion to dismiss." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016); *see also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect[.]'" (quoting *Int'l Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1996))).

caused the loss or damage, but we will pay the cost to repair or replace damaged of fire extinguishing equipment if the damage:

**(1)** Results in discharge of any substance from an automatic fire protection system; or **(2)** Is directly caused by freezing.

Memo. in Support of Mot. to Dismiss, Exhibit 1, ECF No. 19-1 (Nov. 17, 2023) ("Memo. in

Support").

"Water Damage" in the above section is defined as:

c. Water damage means:

(1) Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam; and

(2) Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in c.(1) or c.(2) of this definition of "specified causes of loss", such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the ground surface.

*Id.* ("Water Damage provision").

The policy specifically excludes some types of water-related damage:

B. Exclusions . . .

5

g. Water ("Water Exclusion provision")

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

(2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings; or

(5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraph (1), (3) or (4), or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water. But if any of the above, in Paragraphs (1) through (5), results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

*Id.* ("Water Exclusion provision").

The policy also includes an add-on for up to $15,000 of coverage for:

A. We will pay for direct physical loss or damage to Covered Property, covered under Section I – Property, caused by or resulting from:

1. Water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain; or

2. Water or waterborne material which overflows or is otherwise discharged from a sump, sump pump or related equipment, even if

the overflow or discharge results from mechanical breakdown of a
sump pump or its related equipment.

*Id.* ("Water Endorsement provision").

### C. Procedural History

On September 7, 2023, Plaintiffs filed a Complaint in the Superior Court of Connecticut,
Judicial District of Ansonia-Milford. Compl.

On October 12, 2023, Defendants removed this case to federal court on the basis of
diversity jurisdiction. Notice of Removal, ECF No. 1 (Oct. 12, 2023).

On November 17, 2023, Defendants filed a motion to dismiss with an accompanying
memorandum in support. Mot. to Dismiss, ECF No. 18 (Nov. 17, 2023); Memo. in Support.

On January 17, 2024, Plaintiffs responded to the motion to dismiss and filed an
accompanying memorandum of law with it. Objection to Mot. to Dismiss, ECF No. 22 (Jan. 17,
2023); Memo. in Opp., ECF No. 23 (Jan. 17, 2024).

On February 28, 2024, Defendants replied to Plaintiffs' response to the motion to
dismiss. Reply to Response to Mot. to Dismiss, ECF No. 30 (Feb. 28, 2024).

## II.   STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the
pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon
which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a
complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo
working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere
conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (alteration in original) (citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of N.Y.C.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

### III.   DISCUSSION

Plaintiffs allege in total fifteen counts.

Count One is a breach of contract claim against Chubb National; Count Two is a breach of the implied covenant of good faith and fair dealing claim against Chubb National; Count Three is a CUPTA and CUIPA claim against Chubb National; Count Four is a fraudulent misrepresentation claim against Chubb National; and Count Five is a negligent infliction of emotional distress claim against Chubb National. Counts Six through Ten duplicate these same claims brought against Chubb National, but bring them against ACE Fire. Counts Eleven through Fifteen duplicate these same claims brought against Chubb National, but bring them against ACE Property.

Defendants argue that all claims against ACE Property and Chubb National should be dismissed, as they are not parties to the insurance contract. They then argue that the breach of contract claim against ACE Fire should be dismissed because, as a matter of law, the contract has not been breached.

If the breach of contract claim is dismissed, Defendants argue that all claims should be dismissed, since they are derivative of the contract claim. Finally, Defendants argue that Plaintiffs have failed to plead sufficiently for the breach of good faith, fraudulent misrepresentation, CUPTA/CUIPA, and infliction of emotional distress claims, even if the Court finds that the contract claim can proceed.

The Court addresses each argument in turn.

### A.  The Contract Claims Against ACE Property and Chima National

Under Connecticut Law, "only parties to contracts are liable for their breach." *FCM Group, Inc. v. Miller*, 17 A.3d 49, 54 (Conn. 2011). "Absent privity of contract there is no

standing to bring an action on the contract." *United States Fid. & Gaur. Co., v. S.B. Phillips Co.*, 359 F. Supp. 189, 199 (D. Conn. 2005). The privity requirement applies to "other claims that arise from that contract, including a claim for breach of the covenant of good faith and fair dealing." *Lin v. W & D Assocs.*, No. 3:14-cv-164 (VAB), 2015 WL 7428528, at *7 (D. Conn. Nov. 20, 2015). The issue of who is a party to the contract "is a question of law." *Tucker v. American Intern. Group, Inc.*, 745 F. Supp. 2d 53, 67 (D. Conn. 2010).

Generally, "a contract with a subsidiary does not in and of itself create a contract with the parent company." *Id.* at 69. The parent company and subsidiary are treated as separate legal entities unless the plaintiff "pierces the corporate veil" by demonstrating that the subsidiary passes the "instrumentality" or "identity rule" tests. *Naples v. Keystone Bldg. and Dev. Corp.*, 990 A.2d 326, 341–342 (Conn. 2010).

The instrumentality test requires a showing that the parent company "controlled the affairs" of the subsidiary; "used that control to commit fraud or wrong"; and that the control and wrongdoing "cause[d] the injury or unjust lost." *Id.* at 341 (internal quotations and citations omitted). Under the identity rule, the plaintiff must demonstrate that "there was such a unity of interest and ownership [such] that the independence of the corporations had in effect ceased or had never begun, [and] an adherence to the fiction of separate identity would serve *only to defeat justice and equity by permitting the economic entity to escape liability*." *Id.* at 342 (italicization in original) (quoting *Angelo Tomasso, Inc. v. Armor Constr.& Paving, Inc.*, 447 A.2d 406, 411 (Conn. 1982)). Piercing the corporate veil between the subsidiary and the parent company should happen "only under exceptional circumstances." *Angelo Tomasso*, *Inc.*, 447 A 2d. at 412 (quoting *Newberry v. Barth*, *Inc.*, 252 N.W.2d 711, 714 (Iowa 1977)).

Defendants argue that ACE Property and Chubb National are not parties to the contract, and thus Plaintiff lacks standing to bring a breach of contract claim. Since all claims arise out of the alleged breach, Defendants additionally argue that all other claims against ACE Property and Chubb National should be dismissed.

The Court agrees with respect to the breach of contract, bad faith, and CUIPA/CUPTA claims.[2]

The insurance contract states clearly, "The Policy is issued by the stock insurance company listed above ('Insurer')" with "ACE Fire Underwriters Insurance Company" named above. Memo. in Support, Exhibit 1. The policy additionally states "Issued By (Name of Insurance Company): ACE FIRE UNDERWRITERS INSURANCE COMPANY." *Id.* Thus, ACE Fire is the sole issuer of the insurance policy, and the sole insurer here. *See Tucker*, 745 F. Supp. 2d at 68 (holding that "[u]pon examining the face of the policy, it is clear that National Union is the sole insurer" because the contract "specifies[] 'National Union Fire Insurance Company of Pittsburgh, Pa.' as the insurer" and "nowhere else in the policy is the 'insurer' defined").

Additionally, Plaintiffs offer no allegations that Chubb National, as a parent company, or ACE Property, as an additional subsidiary of Chubb National, have control over ACE Fire at all, let alone a level of control sufficient to meet the identity and instrumentality tests under Connecticut law. As a result, there is nothing in the contract to suggest involvement in this insurance contract by any entity, other than ACE Fire. *See, e.g.*, *id.* at 69 (finding that Plaintiff's

---

[2] The Court does not consider whether the fraudulent misrepresentation and negligent infliction of emotional distress claims against ACE Property and Chubb National arise out of the contract, because, as discussed below, they can be dismissed for other reasons.

allegations of parent company control were sufficient only when subsidiary "appeared to have no separate mind or will of its own").

Thus, this insurance contract is between ACE Fire and Chima Enterprise alone, and the Plaintiffs lack standing to bring the breach of contract and breach of the implied covenant of fair dealing claims against ACE Property and Chubb National. *See Taylor v. Theunissen, M.D. LLC v. United HealthCare Group, Inc.* 365 F. Supp. 3d 242, 246–47 (D. Conn. 2019) ("As merely the parent company of United, UHG is not properly subject to suit[.] . . . Accordingly, I will dismiss all of [Plaintiff's] claims against UHG."); *see also Lin,* 2015 WL 7428528, at *9 (granting summary judgment on breach of contract and bad faith claims when Plaintiff "identified no evidence that [could] satisfy either [the identity or the instrumentality] test").

In the absence of any contractual relationship between Plaintiffs and ACE Property and Chubb National, Plaintiff's CUTPA and CUPIA claims against ACE Property and Chubb National also fail because CUTPA and CUIPA claims "are premised on finding a breach of contract." *Kim v. State Farm Fire & Cas. Ins. Co.*, 751 Fed. App'x 127, 128 n.1 (2d Cir. 2018); *Roberts v. Liberty Mutual Fire Insurance Co.*, 264 F. Supp. 3d 394, 416 (D. Conn. 2017) ("As with breach of implied covenant of good faith and fair dealing, a claim for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract.").

Accordingly, Counts One, Two, Three, Eleven, Twelve, and Thirteen—the breach of contract, breach of the implied covenant of fair dealing claims, and CUTPA/CUIPA claims against ACE Property and Chubb National—will be dismissed.

### B.  The Breach of Contract Claim Against ACE Fire

Connecticut law requires a plaintiff plead "1) the existence of a contract or agreement;

12

2) the defendant's breach of the contract or agreement; and 3) damages resulting from the breach of the contract or agreement" to successfully bring a breach of contract claim. *Chem-Tek, Inc. v. General Motors Corp.*, 816 F. Supp. 123, 131 (D. Conn. 1993).

Defendants argue that Chima Enterprise cannot demonstrate a breach of the insurance contract, because the contract unambiguously precludes coverage for the September and October Incidents. Memo. in Support at 13. In their view, the Incidents were caused by a "blockage in the Building's sewer lines," so the Water Exclusion provision for "[w]ater that backs or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment" limits coverage. *Id.*

Plaintiffs argue that the contract's three main provisions related to the coverage of water-related incidents, the Water Damage provision, the Water Exclusion provision, and the Water Endorsement provision, should be interpreted this way: the Water Damage provision provides the general coverage of water-related incidents; the Water Exclusion provision identifies specific instances in which water damage will not be covered by the policy; and the Water Endorsement provision is an add-on that allows for coverage for incidents otherwise excluded by the Water Exclusion up to a certain amount.

In the Plaintiffs' view, the Water Coverage section of the policy provides coverage for the September and October Incidents and is not excluded by the Water Exclusion provision. Because covered water damage, as defined in the policy, includes "[a]ccidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam," Memo. in Opp. at 8, Plaintiffs argue that this provision includes the plumbing vent clog and subsequent pipe break at issue.

In their view, the Water Exclusion provision's limits on damage caused by "[w]ater that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment" applies to sewage and drainage systems external to a building's internal plumbing. Memo. in Opp at 10–11. In support of this reading of the policy, Plaintiffs point to the other sections of the Water Exclusion provision, which all encompass water that is "weather-induced, natural[,] or gain[s] entry by external means" *Id.* at 11. Additionally, Plaintiffs argue that the example provided in the policy to demonstrate how the Water Damage and Water Exclusion provisions interact suggests that the Water Exclusion targets Water Damage whose primary cause is outside of a building's internal plumbing system:

> But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking.

Because the Court finds that the insurance policy is ambiguous, the Court agrees.

Under Connecticut law, construction of an insurance contract is a question of law for the Court to decide. *Auto Glass Exp., Inc. v. Hanover Ins. Co*, 975 A.2d 1266, 1275 (Conn. 2009). "The determinative question is the intent of the parties, that is, what coverage the insured expected to receive and what the insurer was to provide." *Connecticut Ins. Guar. Ass'n v. Drown*, 101 A.3d 200, 215 (Conn. 2014) (cleaned up). When "the terms of the policy are clear and unambiguous, then the language of the policy must be enforced in accordance with its natural and ordinary meaning." *Connecticut Children's Medical Center, et al., v. Continental Casualty* Co., 581 F. Supp. 3d 385, 389 (D. Conn. 2022). However, when the language is ambiguous, "the policy must be construed in favor of the insured." Id.

"[A] provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." *Johnson v. Connecticut Ins. Guar. Ass'n*, 31 A.3d 1004, 1007 (Conn. 2011). The terms must be considered in context, and "the same language may be found ambiguous and unambiguous as applied to different facts." *Roberts,* 264 F. Supp. 3d, at 403 (quoting *Lexington Ins. Co., v. Lexington Healthcare Grp., Inc.*, 84 A. 3d 1167, 1175 (Conn. 2014)). "Hence, the language of an insurance policy 'must be construed in the circumstances of a particular case and cannot be found to be ambiguous or unambiguous in abstract.'" *Id.* at 403–404 (quoting *Lexington Ins.*, 84 A 3d. at 1175) (italicization omitted).

Plaintiffs' reading of the insurance policy, that an internal blockage and pipe break are covered as long as they are not related to natural or weather-related forces, is a reasonable one. Additionally, common definitions of "sewer" and "sump pump" refer to systems designed to move water and waste in and out of a building, rather than within a building. *See Sewer,* Cambridge Dictionary (online ed., visited Sept. 29, 2024) (defining a sewer as "a large pipe, usually underground, that is used to carry waste water and human waste away from buildings to a place where they can be safely gotten rid of"); *Sump Pump,* Encyclopedia Brittanica (online ed., visited Sept. 29, 2024) ("Sump pump, device that removes accumulations of water or other liquids from a sump pit, the lowest point in a drainage system."). Given these definitions and the plain language of the Water Damage provision, an overflow or back-up from a "sewer, drain, sump, sump pump or related equipment" means an overflow or back-up from a system that is moving waste or water away from a building, not within a building.

This is the case, notwithstanding the caselaw cited by the Defendants, many of which explicitly involve blockages that occurred in sewer lines. *See, e.g.*, *Killian Palms Country Club and Sports Complex v. Scottsdale Insurance Company*, No. 11-CIV-21978-UU, 2012 WL

13012779, at *1–2 (S.D. Fla. Feb. 28, 2012) (involving a "sewer mainline under the kitchen floor" and drains connected to it); *Penn-America Insurance Co. v. Mike's Tailoring*, 22 Cal. Rptr. 3d 918, 920 (Cal. Ct. App. 2005) (involving alleged damage from a "clogged sewer line running underneath [Plaintiff's] property"); *Cardio Diagnostic Imaging, Inc. v. Farmers Insurance Exchange*, 150 Cal. Rptr. 798, 801 (Cal. Ct. App. 2012) (involving "a blockage caused in the sewer line approximately 20 to 40 feet away" from the toilet that overflowed).

Moreover, other courts have found that clogging in interior pipes, rather than sewer lines is not unambiguously excluded in insurance policies with the same or similar language. *See CC 145 Main, LLC v. Union Mutual Fire Ins. Co.*, 306 A. 3d, 1252, 1257 (N.H. 2013) ("Far from settling the issue, the few courts that have been called upon to interpret exclusions identical or nearly identical to the one before us have reached different results.") (collecting contradictory cases). In *CC 145 Main, LLC v. Union Mutual Fire Insurance Company*, the New Hampshire Supreme Court found an identical set of provisions to be ambiguous when applied to "cat litter [poured] down a toilet, clogging an interior pipe." *Id.* at 1254. The court found the Plaintiff's interpretation that the Water Exclusion was limited to "water damage precipitated by off premises circumstances or events" to be reasonable. *Id.* at 1256; *see id.* at 1257 ("It would seem odd to an insured—as it did to the trial court—that a policy providing coverage for frozen and ruptured internal piping would not also provide coverage when an internal pipe fails in a manner that causes a toilet to overflow.").

In any event, given Plaintiffs' allegations here, *see, e.g.*, Compl. Count One ¶ 15 (alleging that the Incidents were caused initially by "improperly discarded wiring/debris into the rooftop vent pipes"); *id.* ¶ 20 (alleging that the improper discarding lead to "a blockage in the building's internal pipelines" and subsequent "pipe break"); *id.* ¶ 32 (alleging that that they

contacted the local water management to confirm that there were no issues with the sewage system that services their property at the time of either Incidents"), there is enough to find an ambiguity as a matter of law, at least for now. *See Lexington, Ins.*, 84 A.3d at 1175 ("Language in an insurance contract, therefore, must be construed in the circumstances of a particular case, and cannot be found to be ambiguous [or unambiguous] in the abstract." (citations, quotation marks, and italicization omitted)); *id.* at 1176 ("A term . . . should be found unambiguous if the facts of the case comfortably fit within the commonly accepted definition of the concept, but may be ambiguous if the facts fall on the margins of a broad reading." (citation and internal marks omitted)).

As a result, because the insurance policy is "reasonably susceptible to more than one meaning," *Johnson*, 31 A.3d at 1007, the breach of the underlying insurance contract is plausibly alleged.

Accordingly, Defendants' motion to dismiss Count Six will be denied.

### C.  The Bad Faith Claim Against ACE Fire

"The duty of good faith and fair dealing is a covenant implied into a contract or contractual relationship." *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014). The duty requires that "neither party do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004) (internal quotation marks and citation omitted). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Id.* (alterations in original). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a

neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. *Id.* at 388.

In insurance cases, bad faith "must allege denial of the receipt of an express benefit under the policy." *Capstone Bldg. Corp v. American Motorists Ins. Co.*, 67 A. 3d 961, 986 (Conn. 2013). "Allegations of a mere coverage dispute or a negligent investigation by an insurer will not state a claim for bad faith." *McCulloch v. Hartford Life and Acc. Ins. Co.*, 363 F. Supp. 2d 169, 177 (D. Conn.); *see also De La Concha of Hartford, Inc.,* 849 A.2d at 388 ("Bad faith means more than mere negligence; it involves a dishonest purpose." (internal quotations marks and citations omitted)).

Plaintiffs allege that ACE Fire acted in bad faith by "fail[ing] to conduct a reasonable and timely investigation", "fail[ing] to confirm coverage for the reported events," and "fail[ing] to pay to the plaintiff the amounts due." Compl. Count Six ¶ 41.

Defendants argue that Plaintiffs have failed to allege facts from which bad faith can be inferred. According to Plaintiffs' allegations, ACE Fire sent an adjuster in November of 2021 after the Incidents, provided a full investigation in January of 2022, and then made initial payments under the policy. Memo. in Support at 17. In any case, Defendants argue, the coverage debate over the claim was reasonable and thus they cannot be said to have been acting in bad faith. *Id.*

The Court agrees.

Plaintiffs do not allege facts demonstrating a sinister motive or any wrongdoing that plausibly rises above negligence. Plaintiffs allege that ACE Fire provided a damage assessment on November 1, 2021, just over two weeks after Plaintiff filed its claims on October 15, 2021. Compl. Count Six ¶15, 17. ACE Fire then allegedly provided a full investigation in January of

2022. Id. ¶ 18. Plaintiff further alleges that Defendant affirmed some coverage for the damages and provided an "Undisputed Funds Payment" in August of 2022. *Id.* ¶ 31. After a final appraisal in January of 2023, ACE Fire determined that Plaintiff was not eligible for additional funds due to a reasonable interpretation of the Water Exclusion provision. *Id.*

Taken together, these allegations do not suggest that ACE Fire had a "sinister motive" in ultimately denying the coverage that Plaintiffs sought. *See Preferred Display Inc. v. Great America Ins. Co.*, 288 F. Supp. 3d 515, 528 (finding summary judgment on a bad faith claim when insurance company had already paid for some coverage and the "remaining [funds were] being withheld by [Defendant] as a result of the dispute regarding the application of [a policy] provision"); *see also Karas*, 33 F. Supp. 3d at 116 (denying to dismiss a bad faith claim when insurance company made a "denial of coverage . . . without the benefit of any inspection" and plaintiffs alleged the company had "a motive to benefit itself").

Accordingly, Count Seven, alleging that ACE Fire breached the implied covenant of good faith and fair dealing, will be dismissed.

### D.  The CUTPA and CUIPA Claims against ACE Fire

CUIPA offers no private cause of action. *Mead v. Burns*, 509 A. 2d 11, 15–16 (Conn. 1986). Instead, a plaintiff may bring a private cause of action under CUTPA to enforce alleged violations of CUIPA.  *Id.* at 18 ("[I]t is possible to state a cause of action under CUTPA for a violation of CUIPA."). Additionally, "conduct by an insurance broker or insurance company that is related to the business of providing insurance can violate CUPTA only if it violates CUIPA." *State v. Acordia, Inc.*, 73 A. 3d 711, 727 (Conn. 2013).

"CUIPA identifies and prohibits a number of 'unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.'" *Kim v. State Farm Fire and*

*Casualty Co.*, No. 3:15-cv-879 (VLB), 2015 WL 6675532, at *5 (citing Conn. Gen. Stat. § 38a-316.). "Among these are '[u]nfair claim settlement practices' such as 'not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.'" *Id.* (quoting Conn. Gen. Stat. § 38a- 316(6)(F)). CUTPA/CUIPA claims "are premised on finding a breach of contract." *Kim*, 751 Fed. App'x at 128 n.1. To prevail on a CUIPA claim, a plaintiff must show that "the unfair settlement practice was committed or performed with such frequency as to indicate a general business practice." *McCulloch*, F. Supp. 2d at 182.

Defendants argue that Plaintiffs fail to state a CUTPA/CUIPA claim because Plaintiffs failed to allege that ACE Fire engaged in conduct with such frequency as to indicate a general business practice. Memo. in Support at 18.

Plaintiffs respond that they have successfully pleaded a CUPTA claim regardless of whether any CUIPA/CUPTA claim fails. Memo. in Opp. at 17.

The Court disagrees.

"[A] single failure to conduct a reasonable investigation of an insurance claim, in the absence of a general business practice, does not constitute a violation of CUIPA . . . ." *Mead*, 509 A.2d at 18. (italicization omitted). And, when a CUPTA claim involves an insurance company and is related to the business of provide insurance, it must be based on a CUIPA violation. *Acordia,* 73 A.3d at 727 ("[C]onduct by an insurance broker or insurance company that is related to the business of providing insurance can violate CUPTA only if it violates CUIPA."). Because Plaintiffs fail to allege that any Defendant engaged in any unfair practices outside of the alleged breach at issue, they have no viable claim under CUIPA; and lacking a

viable CUIPA claim, they also lack a viable claim under CUTPA. *See Mead*, A.2d 11 at 18

("CUIPA require[s] a showing of more than a single act of insurance misconduct.").

Accordingly, Count Eight, the CUPTA/CUIPA claims against ACE Fire, will be

dismissed.

### E.  The Fraudulent Misrepresentation Claims

Under Connecticut law, a plaintiff alleging fraud must show that "(1) a false

representation was made [by the defendant] as a statement of fact; (2) the statement was untrue

and known to be so by [the defendant]; (3) the statement was made with the intent of inducing

reliance thereon; and (4) the other party relied on the statement to his detriment.'" *Stuart v.*

*Freiberg,* 116 A. 3d 1195, 1203 (Conn. 2015) (quoting *Nazami v. Patrons Mut. Ins. Co.*, 910 A.

2d 209, 214 (Conn. 2006)) (alterations in original).

Furthermore, under Rule 9(b) of the Federal Rules of Civil Procedure, "a party [alleging

fraud] must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To

satisfy this rule, a plaintiff must allege "the time, place, speaker, and sometimes even the content

of the alleged misrepresentations." *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986); *Harsco*

*Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996) (observing that when a complaint includes a

claim of fraud, "it must (1) detail the statements (or omissions) that the plaintiff contends are

fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were

made, and (4) explain why the statements (or omissions) are fraudulent" (citations omitted)).

"Where there are multiple defendants, Rule 9(b) requires that the plaintiff allege facts specifying

each defendant's contribution to the fraud." *Alnwick v. European Micro Holdings, Inc*., 281 F.

Supp. 2d 629, 639 (E.D.N.Y. 2003).

Plaintiffs allege that Defendants made "statements and advertisements to induce Plaintiff to purchase insurance coverage for incidents caused by breakdowns/issues within the subject property's pipe and plumbing system" and that the Defendants knew these statements were false. Compl. Counts Four, Nine, and Fourteen ¶ 39.

Defendants argue that Plaintiffs fail to plead with the specificity required to sustain a claim of fraud under Rule 9(b) and Connecticut common law. Memo. in Support at 21.

The Court agrees.

Plaintiffs do not provide any specific factual allegations as to what statements were made and how they were false. See *Luce v. Edelstein*, 802 F.2d at 54 (finding claim insufficient under Rule 9(b) when "no elaboration on what representations . . . were made or why those representations were false"). Plaintiffs also do not provide any allegations as to the identity of the individual speaker or speakers, outside of stating that the Defendants, Chubb, ACE Property, and ACE Fire, made the statements. *See Mills v. Polar Molecular Corp.*, 12 F. 3d 1170, 1175 (2d Cir. 1993) (finding that complaints failed under Rule 9(b) where plaintiff "did not link the alleged fraudulent statements to particular Directors" of the Defendant company); *Alnwick*, 281 F. Supp. 2d at 641 (finding that fraud claim failed when plaintiff "fail[ed] to specify what each defendant said"). Lastly, Plaintiffs provide no allegations as to when and where the statements were made. *See Tatum v. Oberg*, 650 F. Supp. 2d 185, 191 (dismissing claims under Rule 9(b) when plaintiff did not "use sufficient precision in stating when and where" alleged statements were made). As a result, under Rule 9(b), Plaintiffs have failed to provide the allegations necessary to maintain their fraud-based claims.

Accordingly, Counts Four, Nine, and Fourteen for fraudulent misrepresentation will be dismissed.

### F.  The Negligent Infliction of Emotional Distress Claims

For a negligent infliction of emotional distress claim, a plaintiff must show that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 127 (Conn. 2003).

"Alleging the denial of an insurance claim, without more, cannot suffice to maintain a negligent infliction of emotional distress claim." *O'Neill v. Riversource Life Ins. Co.*, No. 3:10-cv-898 (JHC), 2010 WL 3925988, at *2 (D. Conn. Sept. 29, 2010). In *Carrol v. Allstate*, for example, the Connecticut Supreme Court sustained a jury verdict finding negligent infliction of emotional distress when an insurance company conducted an "investigation [that] was not only shoddy, but that [also] possibly was influenced by racial stereotypes" and that resulted in the insurance company blaming the plaintiff for arson. *Carrol*, 815 A.2d at 129.

Plaintiffs claim that Defendants' failure to reach a final decision until seventeen months after the September Incident created an unreasonable and foreseeable risk of emotional distress to Mr. Chima as owner of Chima Enterprise. Compl. Counts Five, Ten, and Fifteen ¶ 43.

Defendants argue Plaintiffs failed to allege facts that suggest Defendants should have realized that its denial of coverage created an "unreasonable risk of causing emotional distress." Memo. in Support at 23.

The Court agrees.

There are no factual allegations suggesting the conduct, and negligence featured in *Carrol v. Allstate*. *See Carrol*, 815 A.2d at 128 (focusing on the "defendant's conduct creating an unreasonable risk of causing the plaintiff's emotional distress and that the plaintiff's distress was

foreseeable"); *see also Craig v. Colonial Penn Ins. Co*, 335 F. Supp. 2d 296, 311 (D. Conn, 2004) (dismissing a negligent infliction of emotional distress claim against an insurance company when company had "reasonable grounds to deny plaintiff's claim" and plaintiffs "failed to identify with any specificity why they claim [insurer's] investigation was procedurally unfair"); *O'Neill,* 2010 WL 3925988, at *2 (dismissing a negligent infliction of emotional distress claim against an insurance company when primary contention was that company denied claim).

Instead, as discussed above, Plaintiffs alleges that, before making its final determination, Defendants had two investigations conducted and made payments based on undisputed provisions of the insurance policy. Defendants then made a final determination not to provide additional coverage, after construing the insurance policy differently from what the Plaintiffs wanted. While the denial of the insurance coverage undoubtedly caused hardship for the Plaintiffs, there is nothing in this Complaint suggesting a "plausible entitlement to relief" on a negligent infliction of emotional distress claim under Connecticut law. *See Iqbal*, 556 U.S. at 679 ("only a complaint that states a plausible claim for relief survives a motion to dismiss.").

Accordingly, Counts Five, Ten, and Fifteen for negligent infliction of emotional distress will be dismissed.

## IV.     CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

The motion to dismiss is **DENIED** with respect to Count Six alleging breach of contract by ACE Fire.

The motion is **GRANTED** with respect to all other Counts.

To the extent that any of the deficiencies identified in this Ruling and Order can be remedied, Plaintiffs must file a motion for leave to amend the Complaint by **November 1, 2024**. If such a motion is not filed by **November 1, 2024**, then all of the claims dismissed by this ruling and Order shall be deemed dismissed with prejudice, judgment shall be entered for Chubb National, and ACE Property, and the caption of this case shall be amended accordingly.

**SO ORDERED** at New Haven, Connecticut, this 30th day of September, 2024

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE